UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ODED BURGER,

      Plaintiff,

v.

NANCY A. BERRYHILL,
ACTING COMMISSIONER of the
SOCIAL SECURITY ADMINISTRATION

      Defendant.

No. 17-cv-12331-DLC

**MEMORANDUM OF OPINION AND ORDER**

Cabell, U.S.M.J.

## I.   INTRODUCTION

Oded Burger moves for an order reversing a decision by the Acting Commissioner of the Social Security (the Commissioner) denying his application for disability insurance benefits. (D. 16). The Commissioner cross moves for an order affirming her decision. (D. 26). The court has jurisdiction pursuant to 42 U.S.C. § 405(g), and the consent of the parties pursuant to 28 U.S.C. § 636(c)(2). For the reasons set forth below, the plaintiff's motion is DENIED and the Commissioner's motion to affirm is GRANTED.

1

## II.  PROCEDURAL HISTORY

On June 29, 2015, the plaintiff applied for Social Security disability insurance benefits under Title XVI of the Social Security Act. (D. 21: Social Security Administration (SSA) Record of Social Security Proceedings, pgs. 181-84 [hereinafter (R. _)]). Because Burger was only insured for disability benefits purposes through December 31, 2014, the success of his application depended on his being able to demonstrate that he was disabled as of that date.  Burger alleged an earlier onset date of July 1, 2012, so the relevant time period for purposes of his application spanned from July 1, 2012 to December 31, 2014.  (R. 181-84).  Burger alleged that he was unable to work due to depression, memory loss, fatigue, sadness and despair.

The SSA denied Burger's application twice, once on September 2, 2015, and again following his request for reconsideration, on December 8, 2015. (R. 83-88, 90-97).  On May 18, 2017, an ALJ determined following an administrative hearing that Burger was not disabled. (R. 21-33).  On September 13, 2017, the Appeals Council denied the plaintiff's request for review of the ALJ'S decision, making it the final decision of the Commissioner.  (R. 1-7).  The plaintiff then initiated this action on November 27, 2017.  (D. 1).

## III. FACTS

### A. Personal and Employment History

Burger was born on December 15, 1954. (R. 305). He graduated from college in 1977. (Id.). He operated his own publishing business from 1989 to 2009, until he lost it due to the advent of the internet and its easy access to information. (R. 305, 439). In 2009, he completed a phlebotomy training course. (R. 305). Since then, Burger has worked, with varying degrees of success, in other capacities including in publishing, as a salesman, a lifeguard, a photography teacher, and an interpreter. (Id.).

### B. Relevant Medical Treatment

In 2009, Burger attended marriage counseling with his wife. He reported that his appetite was good and that he swam daily to stay in shape, which helped him physically and emotionally. He denied problems with attention and concentration and showed no evidence of a thought disorder. He also reported that his hobbies included art, photography, classical concerts, travel, and watching movies. (R. 438-39).

Burger reported that after his wife got sick, he became her caretaker and took over all household chores. (R. 438). A February 2013 preventative medicine visit noted a depressed mood and marked diminished interest. (R. 573).

On March 17, 2014, Dr. Rachel Haims, Burger's primary care physician, noted after an appointment that he displayed normal

judgment and insight with full affect and appropriate mood. (R. 346).

On March 13, 2015, Burger saw Dr. Jonathan Smith for pain in his elbow. He presented as alert and oriented and reported also that he was swimming regularly. (R. 355-56).

On April 6, 2015, Burger saw Licensed Mental Health Counselor (LMHC) Nancy Morse for treatment of symptoms of depression. (R. 585). He presented with a history of long-term untreated symptoms of depression including sleep disturbances, repetitive negative thoughts, and the inability to obtain or maintain employment. (Id.). The treatment plan included cognitive behavioral therapy and interpersonal skill building every two weeks. (Id.).

On June 16, 2015, Burger saw Dr. Haims. She reported that Burger displayed normal judgment and insight with a depressed affect and appropriate mood. (R. 357-358). Burger was started on fluoxetine. (Id.).

At a follow up appointment in July 2015, Burger reported that he had stopped taking his medication because it made him tense and because he still felt depressed. (R. 359). He stated that he had trouble concentrating, attending to tasks, and working but denied difficulty sleeping, and had normal speech, gait, and movements. (R. 359-361). He also displayed normal judgment and insight with full affect and appropriate mood. (Id.). He was prescribed Wellbutrin to address his depression. (R. 361).

On August 10, 2015, LMHC Morse completed a psychiatric disorder form on Burger's behalf. (R. 364-66). She prognosed that he had major depressive disorder with the first signs and symptoms appearing at least two years in the past. (R. 364). Burger reported feelings of worthlessness, an inability to concentrate, and an inability to complete daily chores due to forgetfulness. (Id.).

On August 17, 2015, Burger saw LMHC Morse. She noted that Burger presented as preoccupied, depressed, impaired, and with withdrawn interpersonal skills. (R. 423).

On September 14, 2015, Burger met with LMHC Morse again. He appeared with no apparent distress, with normal speech, gait, and movement, and displayed normal judgment and insight. (R. 420). Morse's notes reflected that Burger left his house most days for at least 30 minutes and was speaking more to his adult children. (R. 424). She noted a slight improvement in his depression, although he subsequently in late September felt overwhelmed by his spouse's health issues. (R. 425).

On October 12, 2015, LMHC Morse met with Burger and noted that he appeared depressed and preoccupied but was still able to help his spouse with the household. (R. 426).

On October 26, 2015, Burger reported to LMHC Morse that he was discouraged over his inability to be productive. (R. 427).

On November 9, 2015, Burger reported that he was still struggling to complete daily activities. (R. 428). His affect was lower than usual and his new health fears were preoccupying his thoughts. (Id.).

On January 19, 2016, Burger reported to Dr. Haims that he was not sure that the Wellbutrin he was taking was helping his mood, although his appetite had improved. (R. 496). Burger stated that he was unable to work and that he had hired an attorney to help him apply for disability following the initial rejection of his application. (Id.).

On March 14, 2016, Dr. Haims wrote a letter addressed "To whom it may concern" in which she stated that she had been treating Burger for the past two years and that he was, in her opinion, unable to work because of "chronic depression." (R. 441).

On or about March 29, 2016, Dr. David Curtiss filled out a mental impairment questionnaire evaluating the plaintiff's ability to do certain types of work or jobs. Broadly speaking, Dr. Curtiss noted the plaintiff showed several signs and symptoms of depression. He also checked off boxes indicating in the aggregate that the plaintiff faced serious limitations in his ability to perform many tasks underlying unskilled or semiskilled work. (R. 441-46).

On April 21, 2016, LMHC Morse completed a similar questionnaire and also rated the plaintiff as facing serious limitations. (R. 448-53).

On November 16, 2016, the plaintiff saw Dr. Jay Krasner, an internal medicine and general practice physician. Dr. Krasner diagnosed the plaintiff with "long-standing" major depressive disorder and recommended that Burger contact his psychiatrist. (R. 531). Subsequently, Dr. Krasner wrote a letter dated December 6, 2016 and addressed "To whom it may concern" that the plaintiff "suffers from major depressive disorder." (R. 527).

On January 17, 2017, Burger saw Dr. Haims. She noted that his depression remained "unchanged" but noted also that he was "managing," and that his depression was "relatively well controlled." (R. 485-86).

On January 20, 2017, LMHC Morse wrote a letter addressed "To whom it may concern" in which she opined that Burger's "daily living skills have deteriorated from some short-term memory issues and he is isolating more at this time." (R. 566).

C. **Administrative Hearing**

The ALJ conducted a hearing on April 25, 2017. (R. 42-82). Burger testified among other things that his depression began when his wife developed disabling nerve pain. (R. 49).

He testified that he could drive to the grocery store and to medical appointments and could take public transportation even though it made him nervous to do so. (R. 50-51).

Burger also testified that he worked for a publishing company in 2012 but was fired because he was unable to perform adequately. (R. 53). Burger felt that he was fired because of his memory lapses and testified that his level of depression increased every time he was fired. (R. 54). Burger testified that he was unable to pay his taxes and bills and was also unable to care for his wife. (R. 59).

At the conclusion of the testimony, the ALJ asked the vocational expert (VE) the following hypothetical:

> Assume an individual of 57 years of age, at the alleged onset date, no 62, with a college education, and a past work history of the claimant's. These limitations are based on Exhibit 3A, the disability determination explanation in this case. Assume further, a light exertional level with the following limitations. Lift, carry 20 pounds occasionally, ten pounds frequently, stand/walk six hours, sit is six hours, there's an unlimited push/pull, and no other limitations prior to the date last insured of December 31, 2014. Could such an individual perform the claimant's past relevant work?

(R. 78). The VE answered affirmatively and testified that there were among other things 97,000 jobs in the United States economy for publishing. (R. 79). The VE also testified that other light unskilled level jobs available to the claimant included hand

packing positions (170,000), marker positions (165,000), and assembler positions (140,000). (R. 79-80).

The ALJ amended the hypothetical to include a restriction based on LMHC Morse's treatment of the plaintiff. The ALJ asked the VE to assume that the individual would be unable to attend full time work on a regular basis and would be absent four days per month and asked if such an individual could perform the claimant's past relevant work. The VE testified that there would not be any work available for such an individual in a competitive environment. (R. 80).

The claimant's attorney posed another hypothetical based on Dr. Curtiss's reports to include limitations on a person's ability to accept instructions, to respond appropriately to criticism from supervisors, to get along with co-workers and peers, and to likely to be off task for 15 percent of the work day. (R. 80-81). The vocational expert indicated that the hypothetical person would not be able to perform any of the jobs previously listed. (R. 81).

Following the administrative hearing, on April 15, 2017, the plaintiff's wife submitted a letter to the ALJ on her husband's behalf. (R. 304). She stated her husband struggled with daily tasks such and had been unable to support them for the last 10 years. (Id.).

## D. **The ALJ's Findings**

On May 18, 2017, the ALJ found that the plaintiff had not proven a disability. The ALJ noted that in order to be eligible for benefits the plaintiff needed to show that he was disabled as of the date last insured, that is, December 31, 2014. The ALJ found that the plaintiff had not shown a disability at any time from July 1, 2012, the alleged onset date, through December 31, 2014. (Id.).

In reaching this determination, the ALJ followed the five-step evaluation process used to evaluate disability claims. *See Seavey v. Barnhart*, 276 F.3d 1, 5 (1st Cir. 2001). Step one asks whether the applicant is engaged in substantial gainful work activity. If so, the application is denied. 20 C.F.R. § 416.920. Step two asks if the applicant has, or has had within the relevant time period, a severe medically determinable impairment or combination of impairments, that is, an impairment that significantly limits the applicant's physical or mental ability to do basic work activities. Id. If not, the application is denied. Id. If so, however, one proceeds to step three, which asks whether the severe impairment meets or equals one of the "listed" impairments in the Social Security regulation. If so, the applicant is disabled. Id. If not, one proceeds to step four, which requires assessing the applicant's residual functional capacity (RFC). Id. If the applicant's RFC indicates that he can

still perform past relevant work, the application is denied.  Id.
If not, one proceeds to step five, which asks if the applicant,
given his RFC, education, age and work experience is unable to do
any other work.  If he cannot, the application is granted.  Id.

In this case, the ALJ determined at step two that the
plaintiff was not entitled to disability benefits.  Specifically,
the ALJ first determined at step one that the plaintiff had not
engaged in substantial gainful activity since the alleged onset
date of July 1, 2012 through his date last insured.  (R. 26).
Moving then to step two, the ALJ found that Burger suffered from
a number of medically determinable impairments, including
depression with alleged fatigue and memory loss as well as left
shoulder tendinopathy.[1]  (Id.).  However, the ALJ determined that
the plaintiff's impairments did not significantly limit his
ability to perform basic work-related activities for 12
consecutive months and for that reason found that he did not have
a severe impairment or combination of impairments.  (R. 29).

In reaching this determination, the ALJ began by explaining
that the phrase basic work-related activities refers to the
abilities and aptitudes necessary to do most jobs, and noted that
such activities include:  (1) physical functions such as walking,

---

[1] The plaintiff does not take issue with the ALJ's determination that his left
shoulder tendinopathy did not constitute a severe impairment.  The court
therefore focuses on the ALJ's treatment of the plaintiff's alleged
depression.

standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  (R. 29).

In determining that Burger did not have an impairment that significantly limited his ability to perform basic work activities, the ALJ first considered whether the plaintiff had an impairment that could be expected to produce the symptoms about which he complained.  Then, for any such impairment, the ALJ evaluated the symptoms to determine the extent to which they limited plaintiff's functional limitations, basing the determination on the objective medical evidence and where appropriate other evidence in the record.  (Id.).

In applying those considerations here, the ALJ found that the plaintiff did have medically determinable impairments that could have been reasonably expected to produce his alleged symptoms. However, the ALJ found that the plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms was not entirely consistent with the medical evidence and other evidence in the record.  (R. 30).  In particular, the ALJ found that although the plaintiff alleged that he was unable to work prior to December 31, 2014 due to depression and his shoulder, he

alleged that his impairments adversely impacted his ability to work to a "considerably more restricted degree than what [was] established by the medical evidence." (R. 30). The ALJ found that the plaintiff's limitations were "self-imposed restrictions" not supported by the medical evidence and found further that some of the limitations were inconsistent with some of the plaintiff's own actions. (Id.).

The ALJ noted among other things that the plaintiff swam on a daily basis, resided with a disabled spouse, worked briefly as a lifeguard, worked after his onset date in the publishing field, never required hospitalization, was on medication prescribed by a primary care physician, was only seen by a marriage counselor prior to the date last insured and only began formal counseling after his date last insured, recently sold his family home, walked his dog, drove around town, used public transportation and even planned to do so after his hearing, maintained his own care, appeared for the hearing well-groomed, and was able to handle the stress of testifying at the hearing. (Id.).

Based on the foregoing, the ALJ determined that, given all the things the plaintiff was able to do, his symptoms no more than minimally affected his ability to engage in work-related activities. The ALJ thus found the alleged impairments to be non-severe through the date last insured, that is, December 31, 2014. (R. 30-31).

The ALJ indicated that she considered several sources in reaching her conclusion. She noted that state agency consultants who were consulted did not render an opinion regarding Burger's disability because there was insufficient evidence to establish the existence of a severe impairment. (R. 31).

The ALJ also considered the "To whom it may concern" letters from LMHC Morse and Drs. Haims and Curtiss, and Dr. Krasner's letter suggesting that the plaintiff had symptoms that made it difficult for him to work, but gave the letters little weight because they opined on the ultimate question of disability, a determination left for the Commissioner. The ALJ also noted that the record did not contain evidence from these providers on or before the date last insured establishing disabling symptoms. The ALJ acknowledged that these providers generally suggested that the plaintiff's depression has been long term but noted that the plaintiff did not begin receiving formal therapy until after his date last insured.

The ALJ in addition considered the "paragraph B" criteria, that is, the four broad areas of mental functioning set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments. See 20 C.F.R. Part 404, Subpart P, Appendix 1. The first functional area is understanding, remembering, or applying information. The second functional area is interacting with others. The third functional

14

area is concentrating, persisting or maintaining pace, and the fourth functional area is adapting or managing oneself.

The ALJ found that the plaintiff had no limitations in any of these areas. Among other things, the ALJ noted that the plaintiff was fully oriented when his primary care providers conducted mental status examinations (first functional area), could tolerate interaction with the general public and co-workers and supervisors (second functional area), was able prior to his date last insured to sustain sufficient focus to perform and complete work timely for two hours at a time for eight hours a day and 40 hours a week, and able more recently to sell his home, navigate the public transportation system and care for a pet and his disabled spouse (third functional area), and could cope with changes in work routines and settings (fourth functional area). Because the plaintiff's impairments caused no more than "mild" limitations in any of the functional areas, they were non-severe within the meaning of the pertinent regulations. 20 C.F.R. § 404.1520a(d)(1).

Based on the foregoing, the ALJ determined that the plaintiff was not suffering under a disability from July 1, 2012 through December 31, 2014. (R. 32).

E. **Post decision events**

Following the ALJ's decision, Burger tried unsuccessfully to present additional evidence to the Appeals Council to press his case and obtain review of the ALJ's decision. (R. 180).

Burger proffered a letter from Dr. Haims dated March 14, 2016, and a letter from Dr. Peter Yaffe dated February 9, 2016, but the Appeals Council noted that these letters were already in evidence and therefore did not consider them.  (R. 2).

Burger also submitted letters from Drs. Curtiss (June 7, 2017), LMHC Morse (July 10, 2017) and Dr. Haims (August 14, 2017), all supporting the notion that Burger suffered from depression and was unable to work.  The Appeals Council noted that the evidence did not relate to the relevant time period from Burger's alleged onset date through his date last insured, that is, July 1, 2012 through December 31, 2014, and concluded that the evidence therefore did not affect the ALJ's decision.  (Id.).

## IV. DISCUSSION

### A. Standard of Review

Review of the Commissioner's decision on disability is limited.  The court may enter a judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing," however, the Commissioner's factual findings are treated as conclusive so long as they are "supported by substantial evidence."  42 U.S.C. § 405(g).  Thus, if "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion" the decision must be upheld.  *Ortiz v. Sec'y of Health*

*& Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) (*per curiam*) (citation omitted).

## B. <u>Analysis</u>

Construing his pleadings most liberally, Burger advances two arguments.  He argues as a threshold matter that the Appeals Council erred when it refused to review the evidence he submitted outside of the administrative hearing.  Burger contends that this evidence was critical because it supported his contention that his depression-related disability had prevented him from working for the last ten years.  As noted, the Appeals Council declined to consider the letters from various health care providers because it found that the evidence was either duplicative of evidence already in the record or was not germane because it did not bear on whether the plaintiff suffered from a disability at any point during the relevant time period of July 1, 2012 to December 31, 2014.

This court finds no basis to question the Appeals Council's treatment of the offered evidence.  The Appeals Council's decision to decline review "is only reviewable to the extent that it rests on an "explicit mistake of law or other egregious error."  *Saenz v. Colvin*, 61 F. Supp. 3d 195, 205 (D. Mass. 2014).  "This avenue of review has been described as 'exceedingly narrow.'"  *Kirby v. Astrue*, No. C.A. 07-42a, 2008 WL 2787926, at *10 (D.R.I. July 17, 2008).

The plaintiff has not identified a law requiring the Appeals

Council to consider the materials or articulated how their refusal to accept the materials would be so egregiously erroneous as to warrant reversal. Nor could he; the Appeals Council logically cannot be faulted for declining evidence that was either already in the record or that was facially not relevant where it related to a non-critical time period. The court finds therefore that there is no basis to review the Appeals Council's decision to decline to consider the supplemental evidence offered by the plaintiff.

That being said, Burger's principal motivation in submitting the supplemental evidence to the Appeals Council appears to be to argue that the ALJ got it wrong, and that the evidence in the record demonstrated that he was suffering from a disability during the relevant time period. In that regard, the plaintiff contends that the three letters from his treatment providers in 2017 "clearly demonstrate [his] case in 2014, while he was insured" for disability benefits. (D. 1). The letters unquestionably support this assertion: Dr. Haims wrote that the plaintiff "has likely suffered from depression for the past ten years, which interfered with his ability to maintain employment; Dr. Curtiss wrote that "[h]e has been unable to be gainfully employed for more than a decade [and] I feel he should be qualified for disability due to his severe depression and his family situation;" and LMHC Morse wrote that she had been treating the plaintiff for chronic

depression since April 2015 and assessed that "his depression had been going on for several years" before that." (Id.).

However, the existence of letters from providers opining on the existence of a disability does not conflate with an automatic finding of disability. Even accepting that the letters taken together have some force, there is no basis to conclude that the ALJ erred. Although the letters themselves were never placed before the ALJ, their underlying message, that the plaintiff had been suffering from depression for some time, was. As the Commissioner points out, the ALJ considered a similarly themed March 2016 letter from Dr. Haims in which she wrote that the plaintiff had been her patient "for the past two years," that she was "treating him with medication for depression," and that he was "unable to work" because of his "chronic depression." (R. 441). Similarly, LMHC Morse completed a mental impairment questionnaire in which she wrote that the plaintiff came to see her at his family's urging "after suffering from, depression that has been going on for over 2 years" and that "has interfered with getting and maintaining work as well as daily functioning." (R. 448).

Moreover, and to be clear, the determination as to whether an applicant is or is not disabled is ultimately left to the ALJ to make and the ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion. See 20 C.F.R. §§ 404.1527(e); 404.1545 and

404.1546.  Accordingly, the ALJ would never have been obliged to summarily accept the providers' opinions and give them controlling weight.

Regardless, an ALJ must "always consider the medical opinions in [the] case record."  20 C.F.R. § 416.927(b).  A treating physician's opinion is generally entitled to controlling weight but the ALJ may discount that weight where it is inconsistent with other substantial evidence in the record, including treatment notes and evaluations by examining and non-examining physicians. *Arruda v. Barnhart*, 314 F. Supp. 2d 52, 72 (D. Mass. 2004).  Where controlling weight is not given to a treating source opinion, the ALJ must consider several factors in determining the weight granted to an opinion, including the length of treatment relationship and frequency of examination, the nature and extent of the treatment relationship, and the consistency of the opinion with the record as a whole.  20 C.F.R. § 416.927(c).  An ALJ is not required to expressly mention each of these factors in the final decision. *McNelley v. Colvin*, No. 15-1971, 2016 WL 2941714, at *2 (1st Cir. 2016).  Rather, an ALJ need only provide "good reasons" for giving little weight to a treating source's medical opinion.  *See id.* at *1 (quoting 20 C.F.R. § 416.927(c)(2)) (internal quotation marks omitted).

The ALJ satisfied her burden here.  As she stated, there is limited medical evidence in the record of Burger's depression for

the relevant period, and that limited medical evidence is moreover not consistent with the severity of the disabling symptoms reported in the letters submitted by his treatment providers. Thus, the medical records for the relevant period do not support the plaintiff's argument that he had a severe impairment preventing him from working.

The ALJ specifically considered the opinions expressed by the plaintiff's treating physicians and found that they were entitled to little weight because, prior to the date last insured, Burger's ability to carry out activities of daily living were reasonably intact. (R. 31). He was fully oriented, his judgment and insight were within normal limits, and his mental status examinations did not suggest substantial difficulties with memory. The plaintiff was also able to drive around town and use public transportation as well as care for a pet and provide care for his wife.

Against this backdrop, there is no basis to find that the ALJ erred in discounting opinions where they were not consistent with the medical evidence before the date last insured.

## II. **CONCLUSION**

For the foregoing reasons, the plaintiff's Motion Reversing the Commissioner's Decision (D. 16) is DENIED, and the Commissioner's Motion for an Order Affirming Her Final Decision (D. 21) is GRANTED.

***SO ORDERED.***

                                        /s/ Donald L. Cabell
                                        DONALD L. CABELL, U.S.M.J.

DATED: March 31, 2019